NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13821


    WILLIAM E. O'CONNOR  vs.  MAG MUTUAL INSURANCE COMPANY.



        Bristol.      April 6, 2026. - August 7, 2026.

   Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
                 Dewar, & Wolohojian, JJ.



Insurance, Liability insurance, Construction of policy,
     Coverage, Defense of proceedings against insured, Insurer's
     obligation to defend.  Contract, Insurance.  Medicine.
     Board of Registration in Medicine.  Doctor, License to
     practice medicine, Prescription.  Declaratory Relief.
     Words, "Professional services."




     Civil action commenced in the Superior Court Department on
August 15, 2023.

     The case was heard by Elaine M. Buckley, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Christopher C. Trundy for the plaintiff.
     Sean M. Ennis for the defendant.


     WENDLANDT, J.  This case concerns the scope of an insurer's

duty pursuant to a "limited regulatory defense" provision of a

medical professional liability insurance policy requiring it to

provide "defense costs" to the insured, a physician, in connection with an administrative proceeding "which arises out of . . . a patient complaint about [the physician's] professional activities."  In particular, we are asked to consider whether, pursuant to this provision, the insurer's duty extended to an administrative proceeding commenced by the Board of Registration in Medicine (board) seeking to suspend the physician's certificate of registration to practice medicine based on a patient's complaint; the complaint centered on the physician's alleged criminal conduct unrelated to his professional treatment of the patient, but also included an allegation that the physician prescribed an addictive medication to the patient when the patient's primary care physician would no longer do so.  Concluding that in these circumstances the insurer's duty to provide regulatory defense coverage was triggered, we vacate the Superior Court judge's order entering judgment in favor of the insurer and remand for further proceedings consistent with this opinion.

1.  Background.  We recite the following facts from the parties' agreed facts and exhibits.

a.  The policy.  In 2019, Dr. William E. O'Connor (physician) purchased a medical professional liability insurance policy (policy) from MAG Mutual Insurance Company (insurer) for the one-year period commencing September 1, 2019 (coverage

period).  The policy required the insurer, inter alia, to provide the physician with "limited regulatory defense" for proceedings regarding his medical license during the coverage period.  The policy defined "regulatory defense" in medical license proceedings as "[d]efense costs for any investigation, hearing, formal action or administrative proceeding brought against [the insured] by any licensing board . . . or regulatory authority which arises out of" either "a covered claim"[1] or "a patient complaint about [the insured's] professional activities."  The policy defined "professional activity" as "[p]roviding . . . medical professional services by [the insured] to a patient."[2]  The policy did not define "professional services."

---

[1] The policy defined "claim" as an action "made by or on behalf of a patient and includ[ing] a civil lawsuit, notice of a civil lawsuit or notice of an intention to hold [the insured] responsible for damages for an incident covered by" the policy; the policy required the insurer to protect the insured from "claims first made . . . during the policy period and arising out of [the insured's] professional activities during the protected period."  The physician does not contend that the board proceedings arose out of a "covered claim," see note 7, infra.

[2] The policy further specified that "professional activity" included "claims for civil damages resulting from [the insured's] violation of laws governing the standards of care in [his] medical practice and [the insured's] duties to [his] patients" (emphasis added).  See note 1, supra.  However, the policy provided that "any acts which are in violation of any other law, statute, ordinance or regulation, including but not limited to willful destruction, [or] alteration or falsification of medical records" were not covered "professional activity"

b.  Board proceedings.  In December 2019, while the policy was in effect, the husband (husband) of the physician's former patient (patient) filed a complaint (board complaint) with the board.  The husband alleged that (i) an abuse prevention order had been issued against the physician for stalking the patient, leaving harassing voicemail messages on her telephone, stealing her mail, and surveilling her property; (ii) the physician had violated the abuse prevention order by trespassing onto the patient's property and attempting to break into her house; (iii) an arrest warrant had issued against the physician as a result; and (iv) the physician had been in a romantic relationship with the patient from 2008 to 2016 and had prescribed an addictive medication to her for about six years during this period.  Pertinently, the husband asserted that the physician prescribed the medication to the patient "as her primary care physician would not fill anymore orders [sic] as he was concerned about the addictive nature of the drug"; the husband stated that the patient "feels that [the physician] used

---

under the policy.  Although the insurer relied, in part, on this latter provision in rejecting the physician's request for coverage, it does not rely on the provision on appeal.  See note 4, infra.

the addictive qualities of the drug as leverage to make [the patient] dependent on him and stay in the relationship."[3]

A board investigation showed that a warrant had issued for the physician's arrest for trespass, violation of an abuse prevention order, and attempting to commit a crime at the patient's property. The police report attached to the warrant stated that the physician had attempted to break into the patient's home; the husband's allegations referenced this incident. The investigation also confirmed that the physician had prescribed an addictive medication to the patient approximately two dozen times between November 21, 2012, and October 4, 2016.

In February 2020, the board's complaint counsel filed a motion for summary suspension of the physician's certificate of registration to practice pending a hearing on whether the physician's license to practice medicine should be revoked. Complaint counsel alleged that the physician "may represent a serious threat to the public health, safety, or welfare" and, in support of her motion, attached an affidavit of the board's

---

[3] The husband later supplemented the board complaint, alerting the board to the physician's continued misconduct. The husband alleged that the physician had stolen mail from his and the patient's mailbox, had forged checks, and had left voicemail messages for the patient despite the terms of the abuse prevention order. The husband subsequently provided the board investigator with a "flash" drive containing materials to support his allegations.

investigator, who averred that he had confirmed much of the husband's allegations. On the same day, the investigator informed the physician of the husband's allegations and advised him that the board had scheduled a hearing on complaint counsel's motion.

c. Coverage dispute. The physician promptly notified the insurer regarding the pending board proceedings and asked the insurer to provide regulatory defense coverage under the terms of the policy. The insurer denied coverage, contending that the regulatory defense provision of the policy required coverage of defense costs only if the administrative proceeding arose out of a "covered claim" or "patient complaint about [the insured's] professional activities." The insurer explained that the board proceedings did not arise out of a "covered claim," which the policy defined as "claims" first made and arising out of professional activities during the policy period, which began on September 1, 2019. See note 1, supra. Because the board complaint alleged that the physician had stopped treating the patient in 2016, before the coverage period commenced, the insurer informed the physician that the claim was not covered and thus that the administrative proceeding did not "arise[] out of a covered claim" as required to trigger the regulatory defense provision of the policy.

The insurer then noted that many of the husband's allegations did not arise from a patient complaint about the physician's "professional activities."  In particular, the insurer stated that the allegations of "stalking, trespass and theft do not appear to relate to any professional services that [the physician] may have provided to [the patient]."  Because the alleged criminal conduct did not concern the physician's professional activities, the insurer contended, the limited regulatory defense provision was not triggered.

Finally, the insurer asserted that "it is possible that prescribing [the addictive medication] as alleged over a period of six years could constitute a violation[] of laws which do not govern the standard of care in [the physician's] medical practice and . . . duties to [his] patients"; and, if so, the conduct alleged "[did] not constitute a professional activity and [therefore] result[ed] in no coverage."  See note 2, supra.[4]

The physician challenged the insurer's denial of coverage and asked the insurer to tender the full amount of the policy limit as regulatory defense coverage, asserting that the physician's defense costs in connection with the board proceedings already had exceeded the policy limit.  The physician explained that the insurer's "covered claim" analysis

---

[4] The insurer does not press this rationale for denial of coverage on appeal.

did not bar regulatory defense coverage because he sought coverage for a proceeding arising out of a patient complaint regarding his professional activities, which -- unlike a "covered claim" -- was not limited to claims first made and arising out of professional activity during the policy period. See note 1, supra.  The physician further asserted that the insurer's denial violated G. L. c. 93A, § 11.

The insurer adhered to its position that regulatory defense coverage was not available under the policy.  The insurer reasserted that the matter did not present a "covered claim" because the physician's treatment of the patient occurred prior to the policy period.  The insurer also asserted that the board matter was not covered because the husband, and not the patient, had initiated the board complaint and thus the board proceedings did not arise from a "patient" complaint.[5]  Finally, the insurer restated its view that "multiple allegations" in the board complaint did not concern the physician's "professional activities," and that "it is possible" that the prescription activity "could constitute a violation[] of laws which do not govern the standards of care," thereby placing those allegations outside the policy's coverage.

---

[5] The insurer does not raise this argument on appeal.

2. <u>Prior proceedings</u>.  The physician commenced the present action in the Superior Court against the insurer seeking a judgment declaring that the insurer had a duty to provide regulatory defense coverage in connection with the board proceedings.[6]  In its counterclaim, the insurer sought a declaration that the policy did not apply.  The parties agreed to a jury-waived trial based solely on agreed facts and exhibits, wherein the physician denied the husband's allegations.

The trial judge concluded that the insurer had no duty to provide regulatory defense coverage.  The judge reasoned that the allegations in the board proceedings did not arise from "professional activities" but from criminal conduct that did not involve providing professional services to the patient.  In response to the argument that the allegation regarding the prescription of medication to the patient sufficed to bring the claim within the policy's coverage, the judge stated that "[t]here is nothing about the claim of over prescribing medication for the purpose of coercing the [patient] to continue her relationship with [the physician] which could be construed as his providing 'professional services' to the [patient]."  The

_____

[6] The physician also alleged breach of contract and violation of G. L. c. 93A, asserting that the insurer's denial of his request for coverage under the policy constituted an unfair and deceptive practice.

court entered judgment in favor of the insurer on all counts. The physician timely appealed, and we transferred the case to this court sua sponte.

3.  Discussion.  a.  Standard of review.  This case requires us to interpret the terms of an insurance policy, "a question of law subject to de novo review."  Rawan v. Contintental Cas. Co., 483 Mass. 654, 662-663 (2019).  Because the parties submitted the case to the trial judge based on agreed facts and a purely documentary record, we are in the same position as the judge to assess the evidence.  See Commonwealth v. Linton, 483 Mass. 227, 233-234 (2019).

When construing an insurance policy, we begin with the policy's plain language, construing the words "in light of their plain meaning [while] giving full effect to the document as a whole[,] . . . consider[ing] 'what an objectively reasonable insured, reading the relevant policy language, would expect to be covered' . . . [and] interpret[ing] the provision of the standard policy in a manner consistent with the statutory and regulatory scheme that governs such policies."  Mount Vernon Fire Ins. Co. v. VisionAid, Inc., 477 Mass. 343, 348 (2017), quoting Golchin v. Liberty Mut. Ins. Co., 466 Mass. 156, 159-160 (2013).  "Any ambiguity [in an insurance policy] should be resolved in favor of the insured[,] and coverage should be

provided."  Vickodil v. Lexington Ins. Co., 412 Mass. 132, 134 (1992).

We agree with the parties that our analysis of the regulatory defense provision of the policy at issue is informed by case law construing so-called "duty to defend" provisions in insurance contracts, which generally require an insurer to defend the insured in suits seeking damages for covered claims or covered losses, including shouldering defense costs such as payment of attorney's fees and costs.  In those cases, the inquiry whether the duty to defend is triggered must be conducted prior to a final determination of the merits of the allegations.  See Metropolitan Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 358 (2011) ("[T]he nature of the claim and not the ultimate judgment against the insured . . . triggers the duty to defend . . . even though the plaintiff may not succeed" [quotation and citation omitted]); 14 J.R. Plitt, D. Maldonado, & J.D. Rogers, Couch on Insurance § 200:3, at 200-17 (3d ed. 2005) ("The duty to defend arises prior to the completion of litigation, and therefore, insurers are required to meet their defense obligation before the scope of the insured's liability has been determined").  The provision before us also concerns the insurer's duty to cover defense costs, an inquiry that similarly must be conducted prior to resolution of the regulatory proceeding on the basis of the allegations made.

In determining whether an insurer has a duty to defend, we have stated that "[a]ny uncertainty as to whether the pleadings include or are reasonably susceptible to an interpretation that they include a claim covered by the policy terms is resolved in favor of the insured, and the insurer must undertake the defense until it obtains a declaratory judgment of no coverage." Deutsche Bank Nat'l Ass'n v. First Am. Title Ins. Co., 465 Mass. 741, 745 (2013). Thus, to determine whether the insurer's duty to provide regulatory defense coverage was triggered by the board proceedings in the matter at bar, we must determine whether the underlying allegations set forth in complaint counsel's motion, which incorporated by reference the investigator's affidavit and attached exhibits, including, inter alia, the board complaint (collectively, the operative complaint), are "reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms," Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc., 480 Mass. 480, 484 (2018), quoting Billings v. Commerce Ins. Co., 458 Mass. 194, 200 (2010), "notwithstanding the possibility that the underlying claim may ultimately fail, or that the merits of the claim are weak or frivolous," Holyoke Mut. Ins. Co. in Salem, supra. See Billings, supra (determining insurer's duty under insurance policy "based on the facts alleged in the complaint, and on facts known or readily knowable by the insurer

that may aid in its interpretation of the allegations in the complaint").

The allegations need not "specifically and unequivocally" trigger coverage; the allegations need only show "a possibility that the liability claim falls within the insurance coverage" (citation omitted).  Billings, 458 Mass. at 201.  See Hirst v. St. Paul Fire & Marine Ins. Co., 106 Idaho 792, 797, 798 (Ct. App. 1984) (although insurer's obligation to defend "depends upon the underlying complaint against its insured, this obligation . . . is present whenever there appears to be a potential for coverage under the policy," and "continue[s] until such time as the claim against the insured is confined to a recovery that the policy does not cover" [citation omitted; emphasis in original]).

Moreover, the duty to provide regulatory defense coverage is triggered so long as one of the allegations that forms the basis of complaint counsel's motion for summary suspension is potentially covered by the regulatory defense provision.  See Mount Vernon Fire Ins. Co., 477 Mass. at 351, citing GMAC Mtge., LLC v. First Am. Title Ins. Co., 464 Mass. 733, 738 (2013) ("The 'in for one, in for all' rule requires that, where an insurer is obligated to defend an insured on one of the counts alleged against it, the insurer must defend the insured on all counts, including those that are not covered"); GMAC Mtge., LLC, supra

at 738-739, citing 1 J.D. Palomar, Title Insurance Law § 11:2, at 907 (2011), and A.D. Windt, Insurance Claims and Disputes: Representation of Insureds & Insurers § 4.13, at 128 (1982) (noting that "[one] rationale behind ['in for one, in for all'] general rule is that dividing representation between covered and noncovered claims is impractical").

b. <u>Professional activities</u>. Pursuant to the regulatory defense provision of the policy, the insurer agreed to provide "[d]efense costs for any investigation, hearing, formal action or administrative proceeding brought against [the insured] by any licensing board . . . or regulatory authority <u>which arises out of</u> a covered claim[7] or <u>a patient complaint about [the insured's] professional activities</u>" (emphases added). The policy defines "professional activity" as "[p]roviding . . . medical professional services by [the insured] to a patient." Here, there is no dispute that the board proceeding is encompassed by "any investigation, hearing, formal action or administrative proceeding brought against [the insured] by any licensing board." The central question on appeal is whether the board proceeding arose out of a patient complaint about the

[7] The Superior Court judge determined that the board proceedings did not arise out of a covered claim because the board complaint was not a civil lawsuit, a notice of a civil lawsuit, or a notice of intention to hold the physician responsible for damages. See note 1, <u>supra</u>. The physician does not challenge this conclusion on appeal.

physician's provision of medical "professional services" to the patient.

The policy does not define the term "professional services."  Absent an express definition in a professional liability insurance policy, we have determined that a "professional service" means

> "one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual . . . .  In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself."

Roe v. Federal Ins. Co., 412 Mass. 43, 48 (1992), quoting Marx v. Hartford Acc. & Indem. Co., 183 Neb. 12, 13 (1968).

Whether a particular act constitutes "professional services" depends on several relevant considerations, including "that membership in [the] profession has traditionally been recognized as requiring the possession of special learning," that "when rendering patient care, [said professionals] are called upon to use or apply special learning," and that there is a "causal relationship between the alleged harm and the complained-of professional act or service, that is, it must be a medical or dental act or service that causes the harm, not an act or service that requires no professional skill."  Roe, 412 Mass. at 49.  The focus of such an assessment is "the act or

service performed rather than the fact that the alleged wrongdoer was a physician."  Id.  In short, "the scope of professional services does not include all forms of a medical professional's conduct simply because he or she is a doctor."[8] Id., quoting Niedzielski v. St. Paul Fire & Marine Ins. Co., 134 N.H. 141, 144 (1991).  "Common sense, of course, will always provide a useful guide in differentiating covered from uncovered cases."  Roe, supra.

With this guidance in mind, the insurer correctly determined that the allegations of the operative complaint centering on the physician's criminal conduct do not comprise professional services.  These allegations included stalking the patient, leaving harassing voicemail messages on her telephone, stealing her mail, surveilling her property, and trespassing onto the patient's property and attempting to break into her house.  None of these actions required membership in the medical profession or involved rendering patient care.  See Roe, 412

---

[8] Other jurisdictions have adopted a similar approach, looking to the act performed by the professional rather than the character of the actor as a professional to determine coverage for alleged professional activities under insurance policies. See, e.g., Horn v. Burns & Roe, 536 F.2d 251, 255 (8th Cir. 1976); Mason v. Liberty Mut. Ins. Co., 370 F.2d 925, 926 (5th Cir. 1967); Gulf Ins. Co. v. Gold Cross Ambulance Serv. Co., 327 F. Supp. 149, 152 (W.D. Okla. 1971); Hirst, 106 Idaho at 796; Niedzielski v. St. Paul Fire & Marine Ins. Co., 134 N.H. 141, 144 (1991); Vigue v. John E. Fogarty Memorial Hosp., 481 A.2d 1, 3 (R.I. 1984); Sanzi v. Shetty, 864 A.2d 614, 618 (R.I. 2005).

Mass. at 49. Perforce, there is no causal relationship between the harm caused by this conduct and any professional service; the acts required no professional skill in medicine. See id. The only connection between the complained-of criminal conduct and the medical profession is the fact that the conduct allegedly was performed by a physician. As such, this conduct is not a "professional service" as required to trigger regulatory defense coverage. See id., quoting Niedzielski, 134 N.H. at 144 ("[T]he scope of professional services does not include all forms of a medical professional's conduct simply because he or she is a doctor").

The allegation that the physician prescribed addictive medication to the patient when her primary care physician would no longer do so in view of the medication's addictive qualities requires a different result. To begin, the prescription of medication to a patient is an act requiring "membership in [the medical] profession [that] has traditionally been recognized as requiring the possession of special learning." Roe, 412 Mass. at 49. Only certain licensed healthcare professionals may prescribe medication, and the scope of this prescriptive authority is governed by both State and Federal law. See Commonwealth v. Stirlacci, 483 Mass. 775, 781 (2020), quoting G. L. c. 94C, § 19 (a) ("The Controlled Substances Act mandates that valid prescriptions for controlled substances 'be issued

for a legitimate medical purpose by a practitioner acting in the usual course of his [or her] professional practice'").  See generally G. L. c. 13, § 10 (establishing and enumerating duties and authorities of board); G. L. c. 94C, § 18 (issuance of prescription by practitioner or physician); G. L. c. 94C, § 19 (prescription; restrictions on issuance).

Moreover, the prescription of medication -- especially addictive or controlled substances -- when performed while "rendering patient care," requires the physician "to use or apply special learning," Roe, 412 Mass. at 49; as such, prescribing medication involves "specialized knowledge, labor, or skill," where "the labor or skill involved is predominantly mental or intellectual, rather than physical or manual" (citation omitted), id. at 48.  See Stirlacci, 483 Mass. at 782 (construing phrase "usual course of professional [medical] practice" in statute governing prescription of controlled substances to mean "the routines customarily expected in the context of the medical profession").  Here, the operative complaint can be read to allege that, at the time the physician prescribed the addictive medication, he was rendering care to the patient, who had been receiving prescriptions for the medication at issue from her primary care physician.  See Billings, 458 Mass. at 200-201 (allegations need only show "possibility" of coverage [citation omitted]).

In addition, at least on the face of the operative complaint, there existed a potential "causal relationship between the alleged harm [to the patient] and the complained-of professional act or service." Roe, 412 Mass. at 49. Specifically, the husband alleged that the physician prescribed a controlled substance to the patient when her primary care physician would not continue to do so in view of its addictive qualities. A fair inference from this allegation is that the patient potentially was harmed by the physician's continued issuance of prescriptions for the drugs, which ran counter to another physician's professional judgment.[9] Compare Standard Fire Ins. Co. v. Blakeslee, 54 Wash. App. 1, 11 (1989) (insurer had no duty to defend dentist accused of sexual assault of patient where "[dentist's] administration of nitrous oxide, although admittedly a professional service, [could not] be said to be a proximate cause of" patient's injuries), with St. Paul Fire & Marine Ins. Co. v. Shernow, 222 Conn. 823, 830 (1992) (insurer was required to indemnify dentist accused of sexual assault of patient for damages stemming from misapplication of nitrous oxide where "there was not only evidence of negligent administration of the nitrous oxide, but also direct, physical

---

[9] In so concluding, we do not suggest the applicable standard of care.

injury proximately caused by the nitrous oxide itself," including permanent damage to patient's lungs).

This case is distinguishable from the circumstances presented in Roe. That case did not concern an insurer's duty to defend; instead, we addressed an insurer's duty to indemnify a dentist who had settled an action brought by a patient who alleged the dentist had sexually assaulted her, including once after administering novocaine for a dental procedure. Roe, 412 Mass. at 44-46. Other than placing the patient in a vulnerable position for his assaultive behavior, there was no finding or admission by the dentist that the administration of novocaine itself harmed the patient. In other words, there was no causal relationship between the patient's harm and the rendering of any professional services. Here, by contrast, because the insurer's duty under the regulatory defense provision is triggered by allegations showing merely a "possibility" of conduct warranting coverage, Billings, 458 Mass. at 201, we must consider that the operative complaint gives rise to an inference that the patient suffered injury, separate and apart from the prolonging of an apparently unwanted relationship with the physician, from the continued prescription of the medication when her primary care physician would no longer prescribe it. Cf. St. Paul Fire & Marine Ins. Co., 222 Conn. at 829-830 (in addition to sexually assaulting patient after administering nitrous oxide for dental

procedure, dentist also caused injury to patient's lungs by improperly administering nitrous oxide to maintain patient's vulnerable state).

In these circumstances, we conclude that the allegations of the operative complaint regarding the prescription of the medication to the patient constitute providing a professional service.  In turn, the operative complaint triggered the insurer's obligation to provide regulatory defense coverage even though, as discussed supra, the complaint also alleges criminal misconduct that falls outside the scope of professional services.  See Mount Vernon Fire Ins. Co., 477 Mass. at 351 ("where an insurer is obligated to defend an insured on one of the counts alleged against it, the insurer must defend the insured on all counts, including those that are not covered"); Simplex Techs., Inc. v. Liberty Mut. Ins. Co., 429 Mass. 196, 199 (1999) ("That some, or even many, of the underlying claims may fall outside the coverage does not excuse [insurer] from its duty to defend these actions").

4.  Conclusion.  Concluding that the insurer's duty to provide regulatory defense coverage was triggered in the circumstances presented, we vacate the Superior Court judge's order entering judgment in favor of the insurer and remand for further proceedings consistent with this opinion.

So ordered.